[Cite as *In re S.C-N.*, 2022-Ohio-3064.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the matter of: | : | |
| [S.C-N.], | : | No. 21AP-544 |
| | | (C.P.C. No. 19JU-03-2909) |
| [L.C., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on September 1, 2022

**On brief:** *Grossman Law Offices,* and *John H. Cousins IV,* for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

JAMISON, J.

{¶ 1} Appellant, L.C., ("mother"), the mother of S.C-N. ("child"), appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating parental rights and awarding permanent custody of S.C-N. to Franklin County Children Services ("FCCS").[1] After a careful review of the record and applicable law, we find no reversible error and affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} One child is involved in this matter, S.C-N., (dob September 10, 2017), was born to L.C. and A.N. ("father"). Father appeared at trial but supports an award of permanent custody to FCCS and is not a party to this appeal.

---

[1] This case was supervised by Permanent Family Solutions Network ("PFSN"), a managed care provider in contract with FCCS. FCCS or PFSN may also be referred to as ("the Agency").

{¶ 3}  Mother has a lengthy and documented history of mental health issues starting in her youth.  Mother reported abuse from her biological mother, who suffered from Munchausen by proxy.  Mother was adopted and was raised in a family with significant financial resources.  The record reveals incidents of self-inflicted injury, (stabbing & cutting herself to require emergency room treatment; jumping off her grandmother's balcony; and over a dozen suicide attempts), compulsive Amazon shopping to the point where unopened boxes block pathways in her apartment and are placed in the child's playpen, and drinking alcohol when she wakes up.  The hoarding activity with Amazon boxes continued in the hotel mother was residing in recently.

{¶ 4}  Mother has been diagnosed with attention deficit hyperactivity disorder, borderline personality disorder, bi-polar disorder, learning disorder, major depressive disorder, insomnia due to mental health disorders, adjustment disorder with depressed mood, and post-traumatic stress disorder.  Mother is prescribed several psychotropic medications.  Mother is 31 years old and is a former competitive body builder.

{¶ 5}  On May 16, 2018, father was charged with domestic violence and assault from an incident in which he was alleged to have pushed mother to the ground while she was holding the minor child, who was eight months old at the time.  On July 12, 2018, father pled guilty to a charge of assault and was sentenced to two years of probation and ordered to stay away from mother and the minor child.  Father has permanently moved to Oregon.

{¶ 6}  In September 2018, mother was admitted to the hospital and spent a week in a behavioral health facility.  On September 28, 2018, FCCS took emergency temporary custody of S.C-N. after locating her at a friend-of-a-friend's house.  The child was initially placed in foster care.  She was then placed in kinship placement with Y.R., a family friend, in October 2018.  Mother's actions towards Y.R. caused Y.R. to withdraw from the placement in February 2019, and the child was returned to foster care.

{¶ 7}  On October 1, 2018, FCCS received a temporary order of custody. Mother was ordered to follow the case plan and complete a mental health assessment.  Due to the passage of time, the case was dismissed and refiled on December 17, 2018 and refiled again under the instant case number on March 11, 2019.  The refiled complaint alleged that the child is neglected and dependent due to mother's significant mental health issues, that the

child has ingested cleaning solution, and she was burned on the arm with a curling iron while in mother's care.

{¶ 8} An adjudicatory hearing began on June 3, 2019, and the minor child was found to be neglected and dependent. Mother did not appear but was represented by counsel and a guardian ad litem ("GAL"); father did not appear and did not have counsel. A dispositional hearing was conducted on June 10, 2019, and the trial court granted temporary court custody to FCCS. Mother was not in attendance at the dispositional hearing. Mother, through counsel, objected to the magistrate's decision, and the parties reached an agreement where the neglect cause of action was withdrawn by the state and the parties stipulated and the child was adjudicated dependent. Mother had a standing order to keep FCCS aware of her current address.

{¶ 9} On November 5, 2019, FCCS and PFSN filed a motion to extend temporary custody, noting mother's lack of progress on the case plan including her failure to complete a psychological evaluation and sign releases for her mental health records. On November 13, 2019, the court conducted an annual review and heard the motion to extend custody. The GAL supported the extension and noted mother's sporadic cooperation and that she cancelled several home visits at the last moment. Temporary custody was extended to allow mother additional time and the matter was set for annual review on March 25, 2020.

{¶ 10} On February 13, 2020, FCCS and PFSN moved for a second and final extension of temporary custody, alleging continued concerns regarding mother's mental health and her lack of communication with the agency. Mother had not obtained stable housing and was living between Ohio and Florida. FCCS also noted that relatives are being considered for potential placement for the child. In lieu of moving for permanent custody, FCCS gave mother additional time to work her case plan towards unification.

{¶ 11} On March 4, 2020, mother pled guilty to one count of operating a vehicle while impaired ("OVI"). The complaint also refers to a theft and obstruction of official business case docketed as 2019-CRB-3288 in the Franklin County Municipal Court, but the disposition of that case is unknown.

{¶ 12} On March 13, 2020, the trial court postponed non-essential non-emergency cases, and operated under curtailed operations for several months due to the COVID-19

pandemic. The motion for second extension of temporary custody was set to be heard on the annual review date of March 25, 2020, but was continued to May 15, 2020, and again continued to August 14, 2020. The trial court extended temporary court custody and set a review date of November 19, 2020.

{¶ 13} On June 30, 2020, the child was placed with F.R and J.R. in California. F.R. is father's stepbrother, and was identified as a potential placement for the child by paternal grandmother when FCCS exploring potential placement with relatives. At the time of trial, the child was doing well and bonded with F.R. and J.R. and their two young boys.

{¶ 14} On October 20, 2020, FCCS filed a motion for permanent court commitment alleging that mother had not completed any case plan objectives, failed to complete drug screens or an alcohol and drug assessment, and failed to engage in mental health services. The motion asserts the "parents have demonstrated a lack of commitment towards the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child (R.C. § 2151.414(E)(4)." (Oct. 20, 2020 Mot. for Permanent Custody.) In addition, the motion states the child has been abandoned, and mother refuses to engage in case plan services. Further, FCCS alleges that the child has been in their custody for 19 months as of the filing of the motion. Finally, it is FCCS' position that the parents have not made sufficient case plan progress or corrected the problems that caused the child's removal in the first place, and the child needs a legally secure permanent placement.

{¶ 15} Mother was served via a waiver of service executed by her probate guardian at the time. Father was not served but did participate at trial. Father stated that he was not contesting the FCCS motion. No objection to service was made by any party during the pendency of this matter and is not addressed on appeal.

{¶ 16} On February 5, 2021, the Franklin County Probate Court appointed a guardian of the person and estate for mother, docketed as case No. 606906. The guardianship was terminated on May 27, 2021.

{¶ 17} The permanent custody motion proceeded to hearing on May 25, June 7, and June 8, 2021. Mother appeared in person on May 25, 2021, and appeared via Zoom on June 7 and 8, and father appeared by Zoom. The first witness for FCCS was the PFSN caseworker, Taylor Brown. Ms. Brown recounted that she was assigned the case in August

2020, and was able "to review the case notes, the case review and just go through all of the stuff that was documented from previous caseworkers." (May 25, 2021 Tr. at 15.) A case plan was developed with the goal of reunifying S.C.-N. with her mother, and Ms. Brown discussed with mother "what needed to be done on her case plan." *Id*. at 17. Ms. Brown testified that mother's case plan objectives included "follow through with her mental health providers * * * completing an alcohol and drug assessment and complying with random urine screens, having stable and safe housing and being able to safely and appropriately parent [S.C-N.]. *Id*. at 18. "Mental health" is the most significant case plan objective. *Id*. at 19. Ms. Brown and mother "have talked about her mental health services in length." *Id*. However, Ms. Brown also testified that there has been a lack of cooperation on mother's part. Ms. Brown has only "been able to access records as of recently" even though she "started requesting releases of information in September" but "did not get a signed release until the end of February." *Id*.

{¶ 18} Ms. Brown recited that she provided mother with information regarding mental health providers, but that mother "was going to link with her own providers or that she was already liked with providers." *Id*. at 20. FCCS ultimately received records from mother's current psychiatrist, Dr. Kristi Maroni, her current counselor, Yvonne Judge, and Sun Behavioral, a mental health treatment center.

{¶ 19} Ms. Brown expressed concern regarding communicating with mother, stating that it is difficult to have a "consistent conversation" with mother because she is "all over the place, so it's very hard to gather all the information I need regarding the services that she's receiving and what she's doing on the case plan." *Id*. at 22-23. "It's just very hard to get a direct answer." *Id*. at 23.

{¶ 20} Ms. Brown testified that, over the time she has been involved with this case, she has not seen an overall improvement in mother's ability to function, and that she had not successfully addressed her mental health concerns. "She is linked with the services, but I do not believe that the behavior changes are apparent." *Id*. at 26. Ms. Brown recited that mother had been in a mental hospital for 10 days in October 2020 and for 3 days in December 2020. *Id*. at 67. Ms. Brown opined that mother's mental health would affect her parenting.

{¶ 21} Ms. Brown also indicated that housing is another issue for mother. "When I became the caseworker, she was staying in a hotel and was looking for housing and prior to that she had been back and forth between Florida and the Agency was really unaware of where she was staying." *Id.* at 27. Mother finally obtained housing in late 2020 that appears adequate, although no one has conducted an in-person visit. Ms. Brown testified that she "was able to complete one via Zoom, but not in person." *Id.* Ms. Brown also noted mother's history of evictions. *Id.* at 30. Ms. Brown believes that mother's residence is safe, but "I don't know if it's stable." *Id.* at 81.

{¶ 22} Ms. Brown recited that a case plan objective addressed substance abuse, "which was a concern in the beginning because mom had received an OVI in 2019." *Id.* at 30. However, Ms. Brown testified that "the Agency has really never been able to get the information they need from the mental health aspect to move on to assess if there's any concerns with alcohol and drugs." *Id.* Ms. Brown testified that mother only completed one drug screen in March 2021. *Id.* at 66.

{¶ 23} Mother was initially provided visitation with S.C-N. in excess of the standard "once a week for one hour" period because S.C-N. was placed with Y.R., a family friend, and mother was able to visit more frequently. *Id.* at 31. However, conflict between mother and Y.R. erupted, and that placement was terminated when "the kinship caregiver asked [mother] to leave the home and she continued to try and threaten her. And so the kinship caregiver had asked that [S.C-N.] be placed elsewhere." *Id.* at 36. S.C-N. was removed from Y.R.'s home and returned to foster care in February 2019. Visitation eroded. Mother "went an extended period of time without visits," and "between January of 2020 until I became the caseworker in September, she was not visiting at all." *Id.* at 31. And now that mother has resurfaced, visits are inconsistent and erratic. Mother "has missed I would say between one to three visits a month. I had to change it to where she had to be on the Zoom at least 30 minutes prior to the visit in order for the visit to happen." *Id.* at 32.

{¶ 24} Ms. Brown supervises the Zoom visits, and believes S.C-N. is bonded with her mother. *Id.* at 33. Ms. Brown relates the visits, when they do happen, go well, but notes that mother sometimes engages in inappropriate subjects like talking "about coming home" and Ms. Brown has to ask mother "to direct the conversation to something else." *Id.* at 34.

{¶ 25} S.C-N. was placed with father's stepbrother in California on June 30, 2020. Ms. Brown testified that FCCS investigated leads and looked for local placement, but "[t]here were no local placements." *Id.* at 35. Mother's leads were always considered, and S.C-N. was placed with a kinship provider suggested by mother from October 2018 until February 2019. *Id.* at 55. Mother did provide names of relatives, including her stepmother and biological mother, but nothing ever developed.

{¶ 26} Mother had not been visiting with S.C-N. when she was placed, and she had not seen her child in several months. The paternal grandmother suggested the placement in California with F.R. and J.R., and FCCS made contact. FCCS completed an Interstate Compact on the Placement of Children ("ICPC") prior to the placement. The ICPC is a statutory law in all 50 states designed to ensure children placed across state lines will be placed in a safe, suitable environment with persons qualified to care for the child. The ICPC provides monitoring during the placement process and ensures compliance with the laws of each state.

{¶ 27} F.R. and J.R. became "licensed foster parents" during the placement process. *Id.* at 39. Ms. Brown has observed S.C-N. interact with F.R. and J.R., and testified that "[s]he's very bonded to them" and "refers to them both as mom and dad and they have two biological sons who she refers to as her brother and she just seems very happy and content there." *Id.* at 39-40. F.R. and J.R. are not interested in legal custody of S.C-N., but "they felt like adoption was a more permanent option for her." *Id.* at 40. Ms. Brown noted that "[t]he Agency is asking for permanent custody. [F.R. and J.R.] are not asking for permanent custody." *Id.* at 75.

{¶ 28} Mother alerted law enforcement in California that S.C-N. should not be with F.R. and J.R., causing the police to come to their home at 3:00 a.m. to investigate a potential kidnapping. Ms. Brown testified that "it was very disrupting to them." *Id.* at 92.

{¶ 29} Ms. Brown recently started receiving medical records, and she believes mother is following recommendations of Dr. Kristi Maroni. (June 7, 2021 Tr. at 12.) However, Ms. Brown testified mother still needs to complete a partial hospitalization or an intensive outpatient program recommended by Sun Behavioral, especially since mother has "had two prior hospitalizations after that recommendation." (Tr. at 13.) Mother has not

provided proof of completion of a parenting class or intensive outpatient treatment at Sun Behavioral. (May 25, 2021 Tr. at 86.)

{¶ 30} Ms. Brown believes that a grant of permanent custody to FCCS is the only way S.C-N. can have a legally secure placement, and recommends "permanent custody for the purposes of adoption." (Tr. at 41.)

{¶ 31} Attorney Lindsey Hutchinson was appointed as successor guardian ad litem ("GAL") for S.C-N. on January 23, 2020. She testified that she reviewed the pleadings in the case and also reviewed the records and files of the prior guardian. (June 7, 2021 Tr. at 32.) Ms. Hutchinson stated that she had "zero contact" with mother until September 2020, even after the GAL "sent multiple emails and called multiple times and went through her counsel" in an attempt to contact her. (Tr. at 17.) When Ms. Hutchinson did make contact with mother and tried to schedule a visit, "[f]or a long time and when I say a long time, I mean from - - from then about September until the end of the year 2020 * * * she did not want us to come and visit." (Tr. at 17-18.)

{¶ 32} Ms. Hutchinson was in communication with FCCS prior to the child's placement, but was not directly involved in the decision. (Tr. at 53.) Ms. Hutchinson expressed general concern about an out-of-state placement, "but at that point [S.C-N.] was not visiting with her mom and her dad was out that way, so to me it - - it was okay." (Tr. at 19.) If a parent is actively engaged and visiting, the parent is notified prior to being moved. (Tr. at 81.) Ms. Hutchinson also recited that mom never offered any maternal relatives for placement, but that the caseworker informed her of mother's stepmother and sister in September 2020. (Tr. at 20.) Ms. Hutchinson noted "that it is always better for kids to be yes, locally, but it is also better for kids to be with family members." (Tr. at 38-39.)

{¶ 33} Ms. Hutchinson testified that mother "was very unhappy about * * * [S.C-N.] being placed with [F.R. and J.R.] and expressed to me that she had called the police in California to report [S.C-N.] as being kidnapped by [F.R.]." (Tr. at 23.) Ms. Hutchinson also related an incident during a September 2020 semi-annual review where "it was very difficult to make sense of what [mother] was talking about." (Tr. at 21.)

{¶ 34} Ms. Hutchinson has never had an in-person home visit with mother, but participated with the caseworker in the virtual home inspection in May 2021. Ms. Hutchinson has observed Zoom visits between mother and S.C-N., and noted that mother

talks to the child in a manner that was not "age-appropriate" regarding when S.C-N. was coming home and "all the new toys and games" purchased for S.C-N. which confused the child. (Tr. at 24.) The GAL also noted that mother "gets very upset * * * when [S.C-N.] calls [F.R. and J.R.] mom and dad and she kept correcting [S.C-N.] * * * that's not your dad that's not your mom I'm your mom and I think that is really confusing for [S.C-N.]" (Tr. at 24-25.) S.C-N. calls her mom by her first name. (Tr. at 25.) When asked by the trial court judge "[d]o you believe that [S.C-N.] recognizes [mother] as her mom, mom?," Ms. Hutchinson replied "I do not believe so." (Tr. at 26.)

{¶ 35} Ms. Hutchinson traveled to California for a home visit in October 2020, and observed S.C-N. interacting with F.R. and J.R. and their two boys at their home and also observed S.C-N. the next morning at her daycare. (Tr. at 27-28.) Ms. Hutchinson relates that S.C-N. "is the center of the household." (Tr. at 27.) Ms. Hutchinson opined S.C-N. "is very bonded to the two of them. She was hanging all over them, you know, very, very comfortable there and - - and she was doing very well in daycare also." (Tr. at 29.) Ms. Hutchinson does not believe S.C-N. is old enough to know what the words permanent custody means, "but I think she's old enough to understand * * * staying with [F.R. and J.R.], or you know, having a * * * permanent home so." *Id.*

{¶ 36} Ms. Hutchinson has had limited communication with father, but is aware of his contact with S.C-N. Ms. Hutchinson testified that her "understanding is that [they are] not visitations, that they - - the family gets together and [S.C-N.] basically treats [father] like uncle." (Tr. at 60.)

{¶ 37} Ms. Hutchinson urged granting the motion for permanent custody "so that [S.C-N.] can achieve permanency." (Tr. at 30.) Ms. Hutchinson expressed concern that parents may not have been given sufficient opportunity to reunify, "but what sets this case apart for me is that again, no contact between January of 2020 and September of 2020 had between [mother] and her daughter." (Tr. at 31.) Ms. Hutchinson places blame for the no contact squarely on mother, "I believe [mother] failed to make that contact." *Id.* The child's GAL also testified that it would not be in the child's best interest to be removed from her present home, and that she was not aware of any prospective legal custodians.

{¶ 38} Ms. Melissa Bosart, a supervisor at PFSN, testified that she was involved in a "team collaborative decision" to place S.C-N. in California. (Tr. at 88.) Ms. Bosart stated

"there's also a team in California that assesses the [F.R. and J.R.] home and does the background checks and makes sure that their home is appropriate and they're able to care for [S.C-N.]. So once we receive the information back from California that the home study has been approved, that's when we have an internal meeting to decide if we are gonna move forward with the placement." (Tr. at 98.) There is no guarantee that F.R. and J.R. will be approved for adoptive placement. (Tr. at 99.)

{¶ 39} Ms. Bosart testified that a caseworker from the appropriate child protective agency in California is provided to S.C-N., and that caseworker "does home visits" and "oversees that placement just as a worker would if she was placed in Ohio." (Tr. at 110-11.) Ms. Bosart stated that Ms. Brown, the local caseworker, "communicates with the California workers and gets the workers observations of the [F.R. and J.R.] home from that worker." (Tr. at 111.)

{¶ 40} Ms. Bosart states that "we had some contact with other relatives, but nothing that was a viable option for placement. There was no follow through on the part of the relatives or a willingness." (Tr. at 89.) Ms. Bosart recites "a lot of times [mother] would provide maybe a name or a relationship, but wouldn't follow through with providing contact information so there was always this - - when we were able to communicate with [mother], it was, you know, I know this person, this person is interested, but we could never obtain enough information to actually reach out to the individuals." (Tr. at 96.) Ms. Bosart notes that the paternal grandmother "communicated with the Agency fairly consistently throughout the case and she recommended [F.R. and J.R.]. (Tr. at 89.) Mother's sister was considered, but "she made it clear that she did not want anything to do with [mother] and she wouldn't want [mother] to know where she lived." (Tr. at 102-03.) In addition, the maternal grandmother came forward, "but she did not follow through with completing anything." (Tr. at 103.)

{¶ 41} Mother testified via Zoom, and stated she was in California. She testified that she has resided in a two-story penthouse in Columbus since August 2020, and that S.C-N. has her own room with a swing in it. Mother described a gate for safety in the bathroom, a locking system for the oven, and also noted that she has a lock on her wine fridge that contains "alcohol and adult beverages." (June 8, 2021 Tr. at 8.) Mother is not employed, but she has "the ability to provide for my daughter" through a trust fund. (Tr. at 9.)

{¶ 42} Mother recites that she has been seeing a counselor, Yvonne Judge, for about six months and she treats for post-traumatic stress disorder two times per week. (Tr. at 11.) Mother also sees Dr. Kristi Maroni, a psychiatrist, and relates she is compliant with her medications. (Tr. at 12.) Mother relates she sought out both providers on her own. *Id.* Mother denies receiving a recommendation to create an intensive outpatient program from Sun Behavioral. (Tr. at 16.)

{¶ 43} Mother testified that she has a support system consisting of "my stepmother * * * who I'm very close to, my biological mother who does not speak English and did not get a translator with CPS, by the way and my friends." *Id.*

{¶ 44} Mother relates her relationship with S.C-N. as "very close" and that "I've been the only person in her life consistently." (Tr. at 17.) Mother has a contrary view to FCCS's suggestion that she has missed visits. When S.C-N. was placed with Y.R., mother saw her "several times a week and even slept over." (Tr. at 20.) After Y.R. relinquished her kinship placement, mother testified that she continued to visit at the new foster home and "didn't miss a visit with her * * * and I was not in Florida." (Tr. at 21.) Mother testified that her in-person visitation stopped in December 2019.

{¶ 45} Mother stated that she did not take any additional drug screens because of COVID, and that she forwarded that information to the GAL and caseworker. (Tr. at 25-26.)

{¶ 46} Mother stated it has always been her intent to reunify with her daughter, and she testified that "I've never given up." (Tr. at 27.) Mother would reside in Columbus with S.C-N., and "would even be willing to work and be supervised for a while with the CPS" on a voluntary basis. *Id.*

{¶ 47} Mother admitted calling the police regarding F.R. and S.C-N. "I was talking to the father, me and him have been off and on in a relationship through this entire thing and he - - I did, I called in to - - to check on my daughter and I - - they said she was not there. I was not notified by anybody, my caseworker, supervisor, anybody that she was moved and then I called [father] and [father] said he was with her. At that time [father] had a no contact order and that was for the protection of [S.C-N.] after he got charged of DV and child endangerment. And I called the police just to make sure - - to do a welfare check." (Tr. at 28.)

{¶ 48} Mother testified that she provided placement leads to the Agency, "but they refused to get an interpreter for my mother who does not speak English * * * and refuse my biological mother." (Tr. at 29.)  Mother also believes "[a] child needs her mother," and would like her daughter returned to her care.  (Tr. at 31.)

{¶ 49} On cross-examination, mother stated "I do not use alcohol" but "I have smoked marijuana." (Tr. at 33.)  Mother denies being arrested for driving under the influence, and offers that it was a misunderstanding because she did not pay for her nails. "I was pulled over in Dublin due to they thought that I - - the guy called the police because he didn't think I was coming back to pay for my nails." (Tr. at 52.)  Mother denies she was drinking, and believes her attorney "bartered [my] charge from a theft charge down to an OVI." *Id.*  Even though S.C-N. was placed in June 2020, mother believes "it's been six months." (Tr. at 38.)  Mother does not think that it would be difficult for S.C-N. to adjust to being removed from her current placement, but if she does have issues, "I have the money and I have the experience myself to provide that for her." (Tr. at 41.)  "I don't think she would miss them." *Id.*

{¶ 50} Mother testified that she did not visit S.C-N. in January or February of 2020 because "I was not allowed to.  You guys told me that it was - - that I couldn't come because of the pandemic." (Tr. at 44.)  Mother asserts that any missed visits in January or February 2020 were not due to her fault. (Tr. at 45.)  Mother also testified on cross-examination that she had telephone contact with her daughter between January and September 2020, and started Zoom visits "in January, when you guys told me I couldn't come." (Tr. at 47.)

{¶ 51} The following exchange with Ms. Hutchinson happened:

> Q. So it is your testimony * * * that between January of 2020 and September of 2020, you were actively engaged in your case plan including meeting with your daughter?
>
> A. Correct.
>
> Q. Okay.  And you've heard my testimony and you've heard the caseworker's testimony and you've heard her supervisor's testimony about * * * activity logs.  Are you saying that the - - all three of us were incorrect?
>
> A. Correct.

(Tr. at 47-48.)

{¶ 52} On September 23, 2021, the trial court issued a judgment entry granting permanent custody of the child to FCCS.

{¶ 53} Mother filed an appeal on October 22, 2021.

## II.  ASSIGNMENTS OF ERROR

{¶ 54} Appellant assigns the following as trial court error:

> [1.] With respect to both sufficiency of the evidence and the manifest weight of the evidence, FCCS failed to present clear and convincing evidence proving that one or more of the criteria in R.C. 2151.414(b)(1) applies and that terminating appellant's parental rights is in child's best interests.
>
> [2.] The trial court committed reversible error by concluding that the three-year old child "wishes to remain" in California.
>
> [3.] The trial court committed reversible error by concluding that, "from January of 2020 through September of 2020, mother wholly abandoned her reunification case plan, COVID-19 'barriers' aside, and neglected to visit [child]."
>
> [4.] The trial court committed reversible error by relying on hearsay testimony offered by a replacement caseworker and guardian ad litem with no personal knowledge of foundation.

## III.  STANDARD OF REVIEW

{¶ 55} Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision. This is a question of law to be reviewed de novo by this Court. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3.  This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 56}  As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest

miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 57} On appellate review,"[p]ermanent custody motions supported by some competent, credible evidence going to all the essential elements of the case will not be reversed * * * as against the manifest weight of the evidence." *In re Brown*, 10th Dist. No. 03AP-969, 2004-Ohio-3314, ¶ 11. Further, in determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct. The underlying rationale of giving deference to the findings of the trial court rests with the understanding that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *In re S.R.*, 10th Dist. No. 05AP-1356, 2006-Ohio-4983, ¶ 38. "In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *In re A.H.*, 10th Dist. No. 20AP-281, 2021-Ohio-1040, ¶ 30.

{¶ 58} Thus, we must look to the entire record to determine whether the trial court had sufficient evidence before it to clearly and convincingly find that it was in the minor child's best interest to terminate the parental rights and award permanent custody to FCCS.

## IV. LEGAL ANALYSIS

{¶ 59} It is clear that "parents have a constitutionally protected fundamental interest in the care, custody, and management of their children." *In re B.L.*, 10th Dist. No. 04AP-1108, 2005-Ohio-1151, ¶ 7, citing *Santosky v. Kramer*, 455 U.S. 745 (1982). "The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child." *In re S.R.* at ¶ 12. "Such rights, however, are not absolute." *Id.* The natural rights of a parent "are always subject to the ultimate welfare of the child." *In re B.L.* at ¶ 7. Thus, under certain circumstances, "the state may terminate the parental rights of natural parents when such termination is in the best interest of the child." *In re D.F.*, 10th Dist. No. 20AP-379, 2021-Ohio-446, ¶ 40.

{¶ 60} The permanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case." *In re Hayes*, 79 Ohio St.3d

46, 48 (1997). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

{¶ 61} Because appellant's first, second, and third assignments of error are intertwined, we shall address them together.

{¶ 62} R.C. 2151.414 sets forth "the procedure for granting permanent custody of a child to an agency such as FCCS." *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 54. The trial court applies a two-part permanent custody test under R.C. 2151.414. *In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914. The court first determines by clear and convincing evidence that one of five possible statutory grounds in R.C. 2151.414(B)(1) is established. Only one of the grounds must be met to satisfy the first prong of the two-part permanent custody test. *In re K.P.*, 12 Dist. No. CA 2021-11-016, 2022-Ohio-1347, ¶ 17. If one of the grounds is established, the trial court then determines if permanent custody is in the best interest of the child under the factors set forth in R.C. 2151.414(D). *Id.* at ¶ 18.

{¶ 63} Pursuant to R.C. 2151.414(B)(1), the court must first determine if one of the following factors exist: (a) the child cannot or should not be placed with the parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives able to take custody; (d) the child has been in the temporary custody of public or private children services agencies for 12 or more months of a consecutive 22-month period; or (e) another child of the parents has been adjudicated as abused, neglected, or dependent on three occasions.

{¶ 64} Here, the trial court concluded that R.C. 2151.414(B)(1)(d) is applicable. The subsection requires a determination that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period." *Id.*

{¶ 65} The trial court found that S.C-N. entered the temporary custody of FCCS on September 28, 2018, and remained in the continuous custody of FCCS from 60 days after the child's removal, November 27, 2018, to the filing of the motion for permanent custody on October 20, 2020. (Sept. 23, 2021 Jgmt. Entry at 22.) Therefore, S.C-N. has been in the custody of FCCS, a public children services agency, for 12 or more months of a consecutive 22-month period. The first part of the permanent custody has been met.

{¶ 66} We note that the trial court continued its part one analysis, and determined alternate grounds. The court found that the child cannot be placed with her parents within

a reasonable time and should not be placed with her parents in accordance with R.C. 2151.414(B)(1)(a).

{¶ 67} The trial court also found that the parents have abandoned their child in accordance with R.C. 2151.414(B)(1)(b). (Jgmt. Entry at 22, 28.)  A child shall be presumed abandoned when the parents have failed to visit or maintain contact for more than 90 days, regardless of whether the parents resume contact with child after that period of 90 days. RC 2151.011(C).  Mother had an opportunity to provide a reasonable explanation for her failure to visit, and did not.  All parties stipulated that FCCS suspended in-person visitation due to COVID on March 18, 2020 and resumed in-person visitation on June 16, 2020. Mother had sporadic visits with the child from July 2019 to January 2020, and did not visit at all – Zoom or otherwise – from January 2020 to September 2020.

{¶ 68} Mother argues that the 22-month temporary custody provision and the 90 day abandonment presumption were tolled by the Supreme Court tolling order, which was effective March 9, until July 30, 2020.  (Appellant's Brief at 36.)  The tolling order cited by appellant was issued on March 27, 2020, in response to the Governor's declaration of a state of emergency because of the COVID-19 pandemic and Am.Sub H.B. No. 197, which, retroactive to March 9, 2020, immediately tolled all statutes of limitations, time limits, and deadline found in the Ohio Revised Code and Administrative Code until July 30, 2020.  *In re Tolling of Time Requirements Imposed by Rules Promulgated by Supreme Court & Use of Technology,* 158 Ohio St.3d 1447, 1448, 2020-Ohio-1166.  However, the tolling order only impacted times established by court rule, and reads "[t]he time requirements imposed by the rules of the Court and set to expire during the term of this order shall be tolled." *Id.* Both provisions are statutory in nature, and the order does not address statutes.

{¶ 69} The motion for permanent custody was filed on October 20, 2020, so the 22-month review period goes back to December 20, 2018.  The child was placed in temporary custody on September 28, 2018, and has remained in that status.  Mother had 18 months to make progress prior to the implementation of the COVID-19 restrictions to make progress, but chose not to do so.  *In re K.R.*, 3rd Dist. No. 17-21-12, 2021-Ohio-4474, ¶ 17. Mother did not visit the child, remotely or otherwise, when the COVID restrictions were in place, and did not access case plan services.  Mother presented no evidence that her ability to work the case plan was impeded by the COVID-19 restrictions.  *In re K.P.*, 12th Dist.

No. CA2021-11-016, 2022-Ohio-1347; *In re A.L.*, 9th Dist. No. 20AP0047, 2021-Ohio-1982, ¶ 18.

{¶ 70} Neither the consecutive 22-month period set forth in R.C. 2151.414(B)(1)(d) nor the 90 day abandonment presumption in R.C. 2151.011(C) is impacted by the tolling order. Mother does not cite any case law in support of her contentions. Further, this issue was not raised below, and "this court will not in the first instance consider errors that the appellant could have called to the trial court's attention." *In re D.K.*, 10th Dist. No. 19AP-801, 2020-Ohio-5251, ¶ 39, citing *In re J.L.*, 10th Dist. No. 15AP-889, 2016-Ohio-2858, ¶ 59. The trial court properly calculated the time and found that the child had been in the temporary custody of FCCS for 12 months of a consecutive 22-month period and had been abandoned.

{¶ 71} Once the trial court determined the statutory factor in R.C. 2151.414(B)(1)(d) was satisfied, it must proceed to the second part of the statutory review, and determine whether "by clear and convincing evidence * * * is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." R.C. 2151.414(B)(1). There are two options to determine best interest in RC 2151.414(D). Under R.C. 2151.414(D)(1), in determining a child's best interest, the trial court shall consider all relevant factors, including, but not limited to the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

The first best interest option weighs multiple factors to determine if granting FCCS permanent custody is in the child's best interest. By contrast, "R.C. 2151.414(D)(2) sets forth a specific set of circumstances where granting permanent custody to FCCS is per se in the best interest of the child." *In re J.R.*, 10th Dist. No. 17AP-698, 2018-Ohio-1474, ¶ 41. Permanent custody is in the best interest of the child if all the following apply:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

R.C. 2151.414(D)(2).

{¶ 72} The two provisions are alternate means to determine best interest, and where the court employs one method, it need not conduct an analysis of the other. *In re S.C.*, 10th Dist. No. 21AP-203, 2022-Ohio-356, ¶ 38. The trial court concluded that R.C. 2151.414(D)(2) controlled the outcome of this matter. The court found clear and convincing evidence established the four R.C. 2151.414(D)(2) factors in this case. (Jgmt. Entry at 28.) The court expressly determined that:

[S.C-N.] cannot be placed with a parent within a reasonable period of time, and should not be placed with a parent; (2) [S.C-N.] has been in the Agency's custody for two years or longer and no longer qualifies for temporary custody; (3) [S.C-N.] does not meet the requirements for a planned permanent living arrangement; and (4) no one has come forward to seek legal custody of [S.C-N.]

(*Id.* at 28.)

{¶ 73} If all four factors apply, "permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency." R.C. 2151.414(D)(2). "A finding under R.C. 2151.414(D)(2) mandates that the trial court find it is in the child's best interest to be placed in the agency's permanent custody." *In re G.W.*, 8th Dist. No. 110938, 2022-Ohio-2581, ¶ 47. If all four R.C. 2151.414(D)(2) factors apply, "then an award of permanent custody is in the child's best interest, and the trial court need not perform the weighing specified in division (D)(1)." *In re S.S.*, 4th Dist. No. 16CA7, 2017-Ohio-2938, ¶ 135.

{¶ 74} "When the juvenile court determines whether a child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, R.C. 2151.414(E) provides guidance." *In re T.L.*, 10th Dist. No. 20AP-591, 2021-Ohio-3221, ¶ 18. The trial court addressed the division E factors in its alternate analysis under R.C. 2151.414(B)(1)(a), and determined that subdivisions (1), (2), (4), (10), (14), and (16) applied.

{¶ 75} Regarding R.C. 2151.414(E)(1), mother has a long history of mental health issues, and while there is improvement over the years, her mental health is a bar to effectively parenting S.C-N. Of note is the recent psychological evaluation conducted by Dr. David Lowenstein at the request of mother's counsel. Dr. David Lowenstein opined that mother requires "extensive psychological and psychiatric care" and concluded "this examiner does not see that [S.C-N.'s] best interests can be secured at this time by [mother] and that placement is in the best interests of this young child." (Dec. 27, 2021 Joint Ex. D, at 10.) Mental health issues were identified as the primary concern for mother, and they remain a concern.

{¶ 76} Mother has informed her psychiatrist, Dr. Kristi Maroni, that she attends all her visits and has complied with everything she was told to do. Ms. Yvonne Judge, mother's counselor, observed that mother has lost her support system and now has inadequate social support. Mother has a history of inconsistent visits with both Dr, Kristi Maroni and Yvonne Judge, and would not appear for an appointment and then not respond to calls or text messages.

{¶ 77} The record is clear that the child was initially placed in the care of FCCS when mother was involuntarily hospitalized for mental health purposes. Mother's mental health condition is severe, and there has been no demonstrated improvement sufficient to return the child. Mother refuses to complete services and has gone several months with no contact with the minor child or FCCS. Mother is estranged from her family, which was her only support system. Mother has been hospitalized for mental health reasons in September 2018, October 2020, and December 2020. The psychological evaluation recommends against unification. Father has no interest in placement. The child is placed with a suitable relative and is the least restrictive, most family like setting available.

{¶ 78} Mother does have a bond with her daughter. However, mother "did not choose to deepen that bond with her child by visiting [her] on a regular basis." *In re R.S.*, 4th Dist. No. 13CA22, 2013-Ohio-5569, ¶ 41.

{¶ 79} Father was removed from the family residence because of a domestic violence issue. Mother reported to Ms. Yvonne Judge a domestic violence incident with C.M., who mother identifies as an ex-boyfriend. C.M. was charged with five domestic violence cases against mother from September 2020 to January 2021. When asked how did the relationship end, mother responded "[t]hat ended lot - - over - - he's not been able to contact, he has an ankle monitor; that has ended –." (June 8, 2021 Tr. at 36.) Mother's continued connection with domestic violence is concerning.

{¶ 80} Mother has failed to substantially remedy the conditions that caused the removal of the child. We conclude that the record supports the trial court's finding that the child could not be placed with either parent within a reasonable time and should not be placed with either parent.

{¶ 81} Under R.C. 2151.414(E)(2), the trial court found by clear and convincing evidence that mother's mental illness "makes her unable to provide an adequate permanent home for [S.C-N.] at the present time and, as anticipated, within 1 year." (Jgmt. Entry at 26.) Under R.C. 2151.414(E)(4), the trial court correctly determined that mother's erratic and inconsistent visitation schedule demonstrates a lack of commitment towards the minor child. Likewise, under R.C. 2151.414(E)(10), mother abandoned her daughter.

{¶ 82} Turning to R.C. 2151.414(E)(16), the trial court determined that there are no suitable relatives able to take custody. It appears some relatives expressed interest or concern, but no one took the initiative to file a motion for legal custody.

{¶ 83} The GAL addresses the wishes of the child with respect to custody as expressed by the child or the GAL. In determining the best interest of a child, the court must consider all relevant factors, including the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child. "The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 84} The GAL traveled to California and was able to observe S.C-N.'s interactions with the placement family. She testified that the child was bonded to F.R. and J.R. and was content and happy. S.C-N. is only four years old, and the GAL determined that the child could not understand the meaning of permanent custody and was not capable of clearly expressing her wishes, and properly expressed the child's wishes. The GAL, however, was able to ascertain the child's comfort and contentment in her surroundings, and provided a solid basis for the court to make a determination. Under the facts of this case, we find the GAL's actions reasonable, and that she adequately expressed S.C-N.'s wishes. The trial court properly concluded that the child wished to remain in her current placement.

{¶ 85} We find that the trial court properly determined that a grant of permanent custody to FCCS was in the best interest of the child under R.C. 2151.414(D)(2).

{¶ 86} In addition to finding that permanent custody was in the best interest of the children under R.C. 2151.414(D)(2), the court made an alternative finding of best interest pursuant to R.C. 2151.414(D)(1). (Jgmt. Entry at 29.) "Since the trial court in this case determined, pursuant to [R.C. 2151.414(D)(2)], that permanent custody was in the child's best interest, it was not necessary for the trial court to also conduct an analysis pursuant to [R.C. 2151.414(D)(1)]. However, alternative findings made by the trial court also support granting FCCS' motion for permanent custody." *In re N.M.*, 10th Dist. No. 20AP-158, 2021-Ohio-2080, ¶ 63.

{¶ 87} We find the record clearly demonstrates that FCCS made reasonable efforts to reunify S.C-N. with her mother. Mother did not make the necessary efforts to reunify as

evidenced by her failure to complete the case plan. Appellant's first, second, and third assignments of error are overruled.

**{¶ 88}** Mother argues that the trial court erred by relying on hearsay testimony from the caseworker and GAL as her fourth assignment of error. R.C. 2151.35(B)(2) states that during a dispositional hearing, the court may admit any evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence. It is not error for a social worker to testify to reports that predated his or her assignment to a particular case. *In re Gilbert,* 8th No. 75469, 2000 Ohio App. LEXIS 1178 (Mar. 23, 2000).

**{¶ 89}** Even if hearsay were barred in dispositional hearings, the social worker could competently testify to the contents of the agency's case file. Evid.R. 803(6) creates a hearsay exception for records kept in the ordinary course of business. *See In re McCullough*, 8th No. 79212, 2001 Ohio App. LEXIS 5392 (Dec. 6, 2001). Likewise, Evid.R. 803(8) creates a hearsay exception for public records and reports which set forth the activities of an agency or office and contain matters observed which, pursuant to a duty of law, the agency or office has a duty to report. *See In re Brown*, 4th No. 06CA4, 2006-Ohio-2863, ¶ 32. Under either exception, a social worker's testimony concerning records kept by the agency, statements made by a parent, and reports taken during the course of the agency's investigation, are admissible because the contents of her file, including the reports against the family, had been compiled as part of the Agency's activities. *In re D.M.*, 5th Dist. No. 18 CA 18, 2018-Ohio-4737, ¶ 27.

**{¶ 90}** The trial court properly relied on the testimony by a successor caseworker and a successor GAL. The mother failed to object to the alleged hearsay, and has waived all but plain error. *State v. Jones*, 91 Ohio St.3d 335, 344 (2001). There is no plain error. Appellant's fourth assignment of error is overruled.

## V. CONCLUSION

**{¶ 91}** The trial court satisfied its statutory duty. The statute requires a weighing of all the relevant factors, and the trial court did that in this case. For the first test, the trial court determined that the child had been in FCCS' temporary custody for 12 or more months in a continuous 22-month period, which is R.C. 2151.414(B)(1)(d). The court then weighed the testimony, the record, exhibits admitted, and made a mandatory best interest finding under R.C. 2151.414(D)(2). Upon our review of all of the evidence presented during

the trial of this case, we find that there is sufficient competent and credible evidence to support the trial court's conclusion that permanent commitment to FCCS is in the best interest of S.C-N. and that conclusion is not against the manifest weight of the evidence.

{¶ 92} Having overruled appellant's first, second, third, and fourth assignments of error, the judgment of the Franklin County Court of Common Pleas, Domestic Relations Division, Juvenile Branch, is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER, P.J., and SADLER, J., concur.

————————————