**[Cite as *In re M.M.*, 2024-Ohio-1488.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: [M.M., | : | |
| E.M., Father], | : | No. 23AP-284 |
| Appellant. | | (C.P.C. No. 19JU-3130) |
| | : | |
| | : | (REGULAR CALENDAR) |
| | : | |

D E C I S I O N

Rendered on April 18, 2024

**On brief:** *Sharon K. Carney*, for appellee Franklin County
Children Services.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M.
Schumann*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

LELAND, J.

{¶ 1} Appellant, E.M. (hereafter "E.M." or "father"), appeals from a judgment of
the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile
Branch, granting permanent custody of his daughter, M.M., to appellee, Franklin County
Children Services ("FCCS").

**I. Facts and Procedural History**

{¶ 2} The following facts and procedural history are drawn from the juvenile
court's decision and judgment entry of April 11, 2023, as well as from the record on appeal
including testimony and evidence presented over the course of a three-day trial. I.B.
(hereafter "mother") is the mother of three children, K.B., O.B., and M.M. E.M. is the father
of one of those children, M.M.

**{¶ 3}** FCCS "became involved with the family in August of 2018 due to allegations related to * * * O.B. experiencing a head injury while in the care of her Father's girlfriend." (Decision at 7.) An FCCS investigation revealed "Mother's children were often in the care of family members and that she was experiencing episodes related to her mental health issues." (Decision at 7.) While voluntarily working with FCCS at that time, mother's "mental health symptoms escalated and the family experienced housing instability." (Decision at 7.)

**{¶ 4}** On March 15, 2019, FCCS filed a complaint alleging that M.M., then age four, was a dependent child under R.C. 2151.04(C). By entry filed March 26, 2019, a magistrate appointed a court appointed special advocate ("CASA") as guardian ad litem for M.M. Following a hearing on June 7, 2019, the juvenile court adjudicated M.M. a "dependent minor" and ordered her into the temporary court commitment ("TCC") of E.M. under the protective supervision of FCCS. (Decision at 7.) On August 19, 2019, the juvenile court adjudicated O.B. an abused child and placed her under court-ordered supervision of FCCS. On December 12, 2019, K.B. was adjudicated to be a dependent minor and, along with sibling O.B., was "ordered into the TCC of FCCS." (Decision at 7.)

**{¶ 5}** On September 29, 2020, a magistrate issued a decision terminating the TCC of M.M. "to father, [E.M.]." (Sept. 29, 2020 Mag. Decision at 2.) The magistrate ordered E.M. to "comply with random urine screens, drug and alcohol assessment and follow recommendations thereof." (Sept. 29, 2020 Mag. Decision at 3.) M.M. was subsequently placed in the care of her maternal aunt, A.B. ("maternal aunt"), along with M.M.'s two half-siblings, O.B. and K.B.

**{¶ 6}** On December 14, 2021, FCCS filed a motion for permanent court commitment ("PCC") of M.M. FCCS also filed motions for PCC in the cases pertaining to O.B. and K.B. By entry filed January 28, 2022, the juvenile court made findings of fact and conclusions of law, including findings that: (1) FCCS made "reasonable efforts to finalize permanency planning"; (2) E.M. "was linked with Maryhaven, Southeast, Inc. ("Southeast"), and Lower Lights for mental health and counseling services"; (3) M.M. "was removed on or about September 2, 2020 when FCCS received TCC"; and (4) M.M. has been in the custody of FCCS for "fourteen out of twenty-two months." (Jan. 28, 2022 Findings of Fact and Conclusions of Law.)

{¶ 7} The matter came for trial before the juvenile court on all three PCC motions on February 21, February 27, and March 1, 2023. E.M. was initially called as a witness by FCCS as on cross-examination. E.M. is the father of one child, M.M. In March 2019, M.M. was placed in E.M.'s custody after FCCS removed M.M. from her mother's care. E.M. had his own housing at the time he received temporary custody of M.M. M.M. was removed from father's custody in June 2020. According to the testimony of E.M., he believed M.M. was removed from his care "because I didn't basically have housing, a stable place to stay." (Feb. 21, 2023 Tr. at 25.)

{¶ 8} E.M. testified his case plan required him to "enter * * * a treatment program" for alcohol and other drugs ("AOD"), "to drop urine screens," and to "basically complete the AOD program, and for, I think, housing as well." (Feb. 21, 2023 Tr. at 25-26.) He stated that an AOD assessment was required "maybe because of my drug screen, because I was on probation at the time." (Feb. 21, 2023 Tr. at 27.) When asked if he had a substance abuse problem, E.M. responded "[n]o." (Feb. 21, 2023 Tr. at 27.) In response to an inquiry whether he had used illegal drugs in the past, E.M. testified: "I have used marijuana and cocaine." (Feb. 21, 2023 Tr. at 27.) He acknowledged using those drugs within the last "[t]wo years," during the time the case with M.M. was open. (Feb. 21, 2023 Tr. at 28.) E.M. also developed a dependency to opioid medication, and he was prescribed Suboxone as part of a medication assisted abstinence program.

{¶ 9} E.M. testified he completed an AOD assessment at Maryhaven treatment facility, but he did not recall when that occurred. He was involved with another treatment facility, Lower Lights, in 2020. After his treatment with Lower Lights, he had relapses in 2021. E.M. was incarcerated on June 21, 2021 and underwent AOD assessment at a community-based correctional facility ("CBCF").

{¶ 10} In November 2022, E.M. informed his caseworker he was planning to relink with AOD treatment at Southeast. He did not follow-up or attend that facility, stating he "found a different * * * treatment center to go to." (Feb. 21, 2023 Tr. at 33.) E.M. acknowledged that, between summer 2021 and January 2023, he had not engaged in any AOD treatment. E.M. stated that, after completing the program at Maryhaven, he "thought basically * * * it was off of the list [be]cause * * * I already completed it." (Feb. 21, 2023 Tr. at 36.)

{¶ 11} E.M. testified he is currently involved in an AOD treatment program at Cornerstone, which he began in 2023. He did not inform his caseworker about his participation at Cornerstone, explaining he was "worried about gettin[g] * * * into the program and * * * doin[g] * * * what I needed to do." (Feb. 21, 2023 Tr. at 34.) When asked how long he would be in treatment at Cornerstone, E.M. responded: "I give at least six months." (Feb. 21, 2023 Tr. at 38.) E.M. acknowledged his caseworker provided him information as to the facility where he was to submit to drug testing for the agency, but he stated: "I haven't been there." (Feb. 21, 2023 Tr. at 38.) E.M. believed he was complying based on the fact he was "dropping for my probation officer," and that "[m]e droppin' (sic) for him was basically as in -- all in one." (Feb. 21, 2023 Tr. at 39.) He stated that FCCS "was supposed to get the results from him as well." (Feb. 21, 2023 Tr. at 39-40.)

{¶ 12} E.M. acknowledged his case plan required him to obtain stable housing. He currently resides at a duplex provided "through Cornerstone," and he does not pay rent. (Feb. 21, 2023 Tr. at 42.) When asked about his current housing agreement timeframe, E.M. stated: "They give you up to like six months." (Feb. 21, 2023 Tr. at 42.) His current residence is a sober living home, and he has two other roommates; E.M. acknowledged this was not a place where M.M. could live with him. Prior to this arrangement, E.M. "was living with [his] dad" and, before that, he stayed at his mother's residence for approximately two years. (Feb. 21, 2023 Tr. at 43.) E.M. previously rented a duplex on North Roosevelt with his fiancée, but he moved out after receiving an eviction notice. He agreed there were times since 2019 when his family resided at hotels to give his father "a break * * * from our kids runnin' (sic) around the house." (Feb. 27, 2023 Tr. at 15.) At the time of trial, E.M. had not begun the process of finding housing.

{¶ 13} E.M. testified he was not currently working; he was most recently employed at a "Burger King" restaurant. (Feb. 21, 2023 Tr. at 45.) E.M. acknowledged he had not provided proof of employment to his caseworker.

{¶ 14} E.M. testified that FCCS offered him a regular visitation schedule with M.M., and that visits with her were scheduled for Saturdays. When questioned whether he had failed to attend visits with M.M. between March 21, 2021 and April 15, 2022, E.M. responded: "I don't think that's correct." (Feb. 27, 2023 Tr. at 17.) When asked how many visits he did attend during that time period, E.M. stated: "I really * * * can't recall the

number." (Feb. 27, 2023 Tr. at 18.)  In response to an inquiry as to the number of visits he had attended since December 4, 2022, E.M. stated: "Probably like 3 or 4." (Feb. 27, 2023 Tr. at 18.)  He was aware that M.M. was transported to the agency whether or not he showed up for the visit.  He acknowledged having "missed some" visitations, and that there were times he had not shown up and did not call to cancel.  (Feb. 27, 2023 Tr. at 19.)  E.M. testified he is bonded with M.M., but he agreed that his failure to attend visits has had an emotional impact on her.

{¶ 15} In March 2019, when M.M.'s case was opened, E.M. was on probation as a result of pleading guilty to attempted burglary on September 17, 2018.  His sentence included three years of intensive supervision on the mental health case load docket.  As a condition of community control, he was required to submit to AOD testing and treatment, and was also required to participate in a cognitive behavioral program as deemed appropriate by his probation officer.  On July 26, 2021, E.M. pled guilty to criminal mischief; the charge was pled down from an initial charge of domestic violence.  E.M. was incarcerated in both the county jail and CBCF from June through October 2021, and his probation was subsequently extended to November 2023.

{¶ 16} Asia Davis is a program manager for FCCS, and she previously served as a child welfare caseworker.  During 2000 and 2001, Davis supervised Delia Swaray, ("Swaray" or "caseworker"), the ongoing FCCS caseworker for M.M.  Davis testified E.M. would "contact me a lot, directly instead of calling the caseworker.  [Swaray] had a hard time * * * making contact with him." (Feb. 27, 2023 Tr. at 90.)  According to Davis, "[a]t times their * * * stories did not match, so I would contact [E.M.] with [Swaray] in my office just to make sure I had the correct information." (Feb. 27, 2023 Tr. at 90.)

{¶ 17} With respect to mother, Davis at times "needed to support the caseworker due to [mother's] behavior, I would go out with [Swaray] to make sure that she felt safe in the home." (Feb. 27, 2023 Tr. at 91.)  She described phone calls with mother as "[a]t times * * * very difficult," noting mother's mental state at that time "wasn't good." (Feb. 27, 2023 Tr. at 92.)

{¶ 18} Davis testified that father was hard to contact.  According to Davis, E.M. "would not keep up with home visits and so I, as a supervisor, would call him while [Swaray] was in my office to try to make arrangements for her to be able to go out and see him."

(Feb. 27, 2023 Tr. at 91.)  Davis conducted a home visit in February 2020 and E.M. was "not there." (Feb. 27, 2023 Tr. at 92.)  The visit was at the home of E.M.'s father, who "really didn't want [Davis] there, but he allowed [her] to interview him and * * * only see the room of where the child was sleeping." (Feb. 27, 2023 Tr. at 92.)

{¶ 19} Davis had discussions with E.M. regarding his involvement in AOD and mental health treatment.  E.M. told Davis "he was court ordered to participate in drug and alcohol and mental health through Southeast," and that it was a term of his probation. (Feb. 27, 2023 Tr. at 94-95.)  E.M. informed Davis "he had a diagnosis, PTSD," for which he was "prescribed medication." (Feb. 27, 2023 Tr. at 95.)

{¶ 20} Davis spoke with E.M. about the need to sign releases for the agency. Initially, E.M. was reluctant to do so "because he did not [want to] be judged based off his past." (Feb. 27, 2023 Tr. at 97.)  Several months later, he did sign releases for FCCS.

{¶ 21} Davis spoke with E.M. about drug testing and she informed him the drug tests he completed for probation were not the same as drug testing for the agency.  Davis "made him aware that we needed him to complete his drug screens through us, through American Court Services." (Feb. 27, 2023 Tr. at 97-98.)  Davis stated she was "very clear" with E.M. about whether FCCS would accept probation drug screens as a substitute for agency screens.  (Feb. 27, 2023 Tr. at 98.)

{¶ 22} Davis testified as to her concerns regarding the appropriateness of E.M.'s housing situation, stating she did not believe E.M. had a stable home based on "the lack of months" that went by during which Swaray "could not make contact" with E.M. and then, "when she did, it was always at different people's homes." (Feb. 27, 2023 Tr. at 99.) According to Davis, "it never seemed like he lived at these places," and that "[i]t was just a place to visit at that moment." (Feb. 27, 2023 Tr. at 99.)  E.M. "admitted" to Davis that "he needed to find shelter." (Feb. 27, 2023 Tr. at 99.)

{¶ 23} On cross-examination, Davis stated she supervised Swaray until June 2021, but she continued to receive calls from E.M. as recently as February 2023; Davis "assumed [E.M.] still thought I was the supervisor." (Feb. 27, 2023 Tr. at 101.)  Davis forwarded this information to Swaray and the current supervisor.  When asked whether E.M. was responsive to agency requests for information about his AOD or mental health treatment, Davis stated "he just didn't follow through." (Feb. 27, 2023 Tr. at 103.)

{¶ 24} Davis reiterated her concerns as to E.M.'s housing stability "[b]ecause we were not able to see him at the same place every time the home visits * * * occurred." (Feb. 27, 2023 Tr. at 106.) Davis related that during a "February visit, I was * * * told that he was at work when in fact he was in jail." (Feb. 27, 2023 Tr. at 106.) During the time E.M. resided with his father, "it was not a permanent situation." (Feb. 27, 2023 Tr. at 107.) The agency did not initially have mental health concerns regarding E.M., but after the case opened "we realized * * * there was some mental health concern." (Feb. 27, 2023 Tr. at 108.) On re-direct, Davis stated E.M.'s "mental health * * * didn't * * * appear to be stable" as the case moved forward. (Feb. 27, 2023 Tr. at 109-10.)

{¶ 25} Swaray, E.M.'s caseworker through FCCS was assigned to the case on October 14, 2018. FCCS initially became involved with the children on April 16, 2018 following allegations of physical abuse of O.B., a half-sibling of M.M. A complaint regarding O.B. was filed in March 2019. M.M. was found to be a dependent child on July 23, 2019, and FCCS eventually took temporary custody of all three children from mother. For several weeks in 2020, M.M. was placed with her paternal grandmother. M.M. was removed from her paternal grandmother's home and placed in her maternal aunt's home "[b]ecause it was stated that [E.M.] was intoxicated around [M.M.]." (Feb. 27, 2023 Tr. at 124.) Since 2020, all three children have been placed with their maternal aunt. According to Swaray, other relatives were considered for potential placement.

{¶ 26} Swaray has spoken with both mother and E.M. about their case plans. Swaray testified she has discussed E.M.'s case plan with him "numerous times," and that "every time he will ask me for the case plan, I'll give it to him and then when I see him the next month, he will ask for * * * it [again] and I'll give it to him." (Feb. 27, 2023 Tr. at 126.) She has also emailed the case plan to E.M. "quite a few times." (Feb. 27, 2023 Tr. at 126.)

{¶ 27} Mother's case plan required her to "engage in mental health and psych evaluation[s]." (Feb. 27, 2023 Tr. at 128.) Mother "had told us that she hear[s] voices. So, we made * * * a referral for a psych evaluation." (Feb. 27, 2023 Tr. at 129.) Swaray testified mother had "not really engage[d]" in services "since the case was open"; mother "would start but never continue." (Feb. 27, 2023 Tr. at 129.) Swaray observed home visits during which mother "would talk to herself." (Feb. 27, 2023 Tr. at 129.) Mother did not complete

a mental health or psychological evaluation, nor was she compliant with counseling and medication management.

{¶ 28} E.M.'s case plan involved "mental health, AOD, screens and stable housing; and [compliance] with probation." (Feb. 27, 2023 Tr. at 129.) E.M. informed the agency "he needed mental health" services, and that "he had some diagnoses." (Feb. 27, 2023 Tr. at 131.) Swaray gave E.M a referral, but "he was already in services" with "Southeast." (Feb. 27, 2023 Tr. at 131.) E.M. engaged in services with Southeast in November 2019, and "his goal was to complete the program and monitor sobriety." (Feb. 27, 2023 Tr. at 131.) E.M. also engaged in services at Maryhaven "around March 2020." (Feb. 27, 2023 Tr. at 132.) He "completed an inpatient program," and was then "referred to Lower Light[s] a month after that." (Feb. 27, 2023 Tr. at 132.) According to Swaray, E.M. "was asked to continue to engage in that program," but Swaray was informed "he did not complete the program." (Feb. 27, 2023 Tr. at 132.) Since 2020, "the only other program" Swaray could "attest to" E.M. participating in was "when he was at * * * CBCF." (Feb. 27, 2023 Tr. at 132.) E.M. "did AOD there," and Swaray "received screens from CBCF at that time." (Feb. 27, 2023 Tr. at 132.)

{¶ 29} E.M.'s case plan included completing an AOD assessment. After E.M. completed the program at Maryhaven, Swaray continued to have concerns with his AOD issues, and she recommended other resources to him. Swaray discussed resources with E.M. "[e]very time" she visited him, and he would "tell me that he will call them." (Feb. 23, 2023 Tr. at 133.) Swaray was unable to verify that E.M. had completed an updated AOD assessment since Maryhaven in 2020. Swaray related having a meeting with E.M. last summer during which "he appeared to be under the influence" of alcohol. (Feb. 27, 2023 Tr. at 134.) Swaray testified that E.M.'s breath "smell[ed] [of] alcohol and he * * * could not stand in one place. It was like he was about to fall when he was talking to me." (Feb. 27, 2023 Tr. at 135.) That same day, E.M. also had a housing appointment, and "[t]he worker * * * called [Swaray] to let me know that she observed him to be under the influence." (Feb. 27, 2023 Tr. at 134.)

{¶ 30} Swaray discussed with E.M. the drug testing component of his case plan. She referred him to American Court Services, now named "AverHealth," for drug testing. (Feb. 27, 2023 Tr. at 137.) E.M. did not sign up for testing with AverHealth, and he did not

submit to tests at that facility. Swaray stated E.M. "keeps telling me that he will * * * and he has never done it." (Feb. 27, 2023 Tr. at 138.)

{¶ 31} Swaray testified regarding the case plan objectives for the parents to have stable housing and income. When Swaray was initially assigned to the case, mother "was living together with the children," but "she lost that housing, and she went to live with her sister." (Feb. 27, 2023 Tr. at 139.) Mother subsequently "went into [a] shelter," and then had "her own place," but she "[c]ould not maintain that housing" and went "back to the shelter." (Feb. 27, 2023 Tr. at 139.) Mother "was at the shelter for a few weeks and then she got [the] housing that she's in right now." (Feb. 27, 2023 Tr. at 139.)

{¶ 32} With respect to E.M., when Swaray was initially assigned to the case E.M. "was living in his own house," but "then he reported that they had financial difficulties, so he had to move to his father's house." (Feb. 27, 2023 Tr. at 140.) E.M. "was in between his father's and his mother's house. And at one point in time, he had considered going to [a] shelter, but it did not happen." (Feb. 27, 2023 Tr. at 140.) Swaray related that on at least three occasions she had met with E.M. "at a hotel * * * when he was staying there with [M.M.]." (Feb. 27, 2023 Tr. at 140.) Swaray's last contact with E.M. was in November 2022, and he was at that time staying "at [a] friend's house." (Feb. 27, 2023 Tr. at 140.) E.M. informed Swaray he was going to "work with Southeast to help him with housing and other services that he needs to engage in." (Feb. 27, 2023 Tr. at 140.)

{¶ 33} Swaray recounted difficulties maintaining contact with E.M. during the course of the case. She testified those difficulties involved "[h]ome visits, phone contact, he's had quite different numbers that [have] not been provided to me[.] * * * So, if I don't get him on the phone, I will go to home visit. And I have been * * * to like seventy percent of home visits without being able to see him." (Feb. 27, 2023 Tr. at 141-42.)

{¶ 34} Swaray testified E.M. had not provided the agency proof of income, although he did show her paystubs for November 2022. E.M. "had asked if FCCS can pay his rent." (Feb. 27, 2023 Tr. at 143.) E.M. also asked Swaray if she would personally loan him "$60.00 or $65.00 to pay for a deposit -- housing application." (Feb. 27, 2023 Tr. at 143.) Swaray provided E.M. resources to assist him with housing, including a referral to an assistance organization, "Family-to-Family," over "four times." (Feb. 27, 2023 Tr. at 145.) E.M.'s failure to "maintain contact with them" resulted in case closures. (Feb. 27, 2023 Tr. at 144.)

Swaray stated that neither of the parents had demonstrated stable housing at this time. She noted E.M. was incarcerated "at the CBCF over the summer last year." (Feb. 27, 2023 Tr. at 145-46.)

{¶ 35} Swaray testified the parents were offered supervised visitation "once a week." (Feb. 27, 2023 Tr. at 146.) Swaray stated that mother's visitation "was inconsistent." (Feb. 27, 2023 Tr. at 147.) Swaray spoke with mother about missed visits and "[s]he said she couldn't make it. There was no specific reason why." (Feb. 27, 2023 at 147.) Swaray testified that mother has been diagnosed with "schizophrenia." (Feb. 27, 2023 Tr. at 174.)

{¶ 36} Swaray also cited issues with E.M.'s consistency in attending visitations with M.M. Swaray spoke with E.M. about missed visits, and he provided "[n]o specific reason why." (Feb. 27, 2023 Tr. at 148.) Swaray stated there have been periods during which E.M.'s visits with M.M. were removed from FCCS's visitation schedule "[b]ecause of no show, no call." (Feb. 27, 2023 Tr. at 148.) Swaray noted a parent is removed from the schedule as a result of "[t]hree * * * consecutive no shows," and that E.M.'s visitations have been removed "at least six times." (Feb. 27, 2023 Tr. at 148-49.) Swaray testified "there was a point in time from March 2021 around the same time 2022" when E.M. did not attend visits with M.M. (Feb. 27, 2023 Tr. at 149.) Swaray stated E.M.'s last visit with M.M. was December 3, 2022. At the time of trial, E.M.'s status as to current visits with M.M. was "[o]ff the schedule" because of "no call, no show." (Feb. 27, 2023 Tr. at 149.)

{¶ 37} Swaray testified E.M. has a "very good relationship" with M.M. and they are "well bonded." (Feb. 27, 2023 Tr. at 151-52.) Swaray further testified that M.M. and the other siblings "have a very loving and bonded relationship" with their maternal aunt, with whom the children are currently placed. (Feb. 27, 2023 Tr. at 152.) According to Swaray, the children "present to be well and healthy every time I see them in their maternal aunt's home." (Feb. 27, 2023 Tr. at 153.) Swaray had no concerns about the maternal aunt's ability to meet each of the children's needs. Swaray stated the maternal aunt is a prospective adoptive home for the children, and the caseworker recommended the children "be in the home of their maternal aunt." (Feb. 27, 2023 Tr. at 153.)

{¶ 38} Christa Metzger (hereafter "Metzger" or "GAL") is a lay guardian ad litem; Metzger, who also serves as a case manager for CASA, was assigned to the case in March 2019 through CASA. Metzger did not believe mother "would be able to care for the

children." (Feb. 27, 2023 Tr. at 194.) Metzger's initial contact with mother was at an apartment where mother was subsequently evicted. Metzger noted there were times mother was staying in a shelter with the children, and she had "transitional housing" throughout the period the GAL worked with her. (Mar. 1, 2023 Tr. at 14.) While noting mother now has an apartment, Metzger stated the location and "the conditions of where she's living would not be appropriate for her to have custody." (Mar. 1, 2023 Tr. at 16.)

{¶ 39} Metzger further cited the concern that mother "does have mental illness that we understand is Schizophrenia." (Mar. 1, 2023 Tr. at 16.) Mother "made it clear that she was not interested in taking medication; refused to take the medication." (Mar. 1, 2023 Tr. at 16.) That circumstance "ultimately led to the * * * removal of her children because she began behaviors that were frightening the children." (Mar. 1, 2023 Tr. at 16-17.) Metzger "would not consider her a good candidate for the children's best interest." (Mar. 1, 2023 Tr. at 18-19.)

{¶ 40} Metzger first met with E.M. when he was "living with [his] fiancé[e] * * * in a duplex." (Mar. 1, 2023 Tr. at 21.) Metzger has met with E.M. "pretty regular[ly] except when he's not been accessible." (Feb. 27, 2023 Tr. at 192.) Metzger testified "there have been periods where he has sort of dropped out of sight." (Feb. 27, 2023 Tr. at 192.)

{¶ 41} After the children were removed from mother's care, E.M. had temporary custody of M.M. for a period. Metzger described E.M.'s relationship with M.M. as "very close." (Mar. 1, 2023 Tr. at 22.) According to Metzger, "the problem has been that [E.M.] does have issues with * * * substance abuse, alcohol abuse. And over the period of time that I've known him, he has gotten sober, been dedicated to being a good father, has tried to do * * * many of the things that he's supposed to but has just not been able to do it." (Mar. 1, 2023 Tr. at 22.) The GAL testified E.M. "has not been able to find stable housing," and he has "not been able to find a job that is of any length and time." (Mar. 1, 2023 Tr. at 22.) E.M.'s last permanent address was at a condo from which he was eventually evicted. Metzger stated that "he's just not been able to accomplish what he set out to accomplish." (Mar. 1, 2023 Tr. at 22.)

{¶ 42} Metzger related that she and Swaray have "coached [E.M.], have talked to him, have provided him with additional resources," but "he just hasn't been able to pull it together." (Mar. 1, 2023 Tr. at 23.) Metzger testified E.M. "is currently in a program getting

sober again, * * * but it is a cycle that I've seen happen, in the four years, three times."
(Mar. 1, 2023 Tr. at 23.) While noting E.M. "is a loving father," Metzger stated: "I just
cannot say that he can provide what she needs and meet her best interests at this time."
(Mar. 1, 2023 Tr. at 23.)

{¶ 43} The GAL stated her "recommendation is that the PCC go forward, it be
approved," and the children "remain * * * with maternal [] aunt who is their current
caregiver." (Mar. 1, 2023 Tr. at 28.) Metzger testified the children have been with the
maternal aunt "for two and a half years," and the children "have grown, they have thrived,
they have the security and stability they've never had. They are bonded with her, [and] she
with them." (Mar. 1, 2023 Tr. at 28-29.) Metzger related the maternal aunt "is very clear
that she wants to adopt them, and she wanted me to share that with the Court." (Mar. 1,
2023 Tr. at 29.) The maternal aunt is a "single professional and she took on three kids
because she did not want them to be lost to the family." (Mar. 1, 2023 Tr. at 29.) Metzger
stated the maternal aunt "has made sure that they have all of the care * * * they need,"
including medical, dental, and testing for developmental progress. (Mar. 1, 2023 Tr. at 32.)

{¶ 44} On cross-examination, Metzger testified as to the interaction of the children
with each other, stating that siblings O.B. and K.B. have "the tightest bond." (Mar. 1, 2023
Tr. at 30.) Metzger further related that M.M. "is bonded with them, particularly now, since
she's been with them for the two years with [maternal] aunt." (Mar. 1, 2023 Tr. at 31.)
Metzger stated "the three of them having been siblings now, under the same roof, for two
and a half years definitely have bonded." (Mar. 1, 2023 Tr. at 31.)

{¶ 45} Metzger was questioned about the maternal aunt's willingness to allow
contact with E.M.'s family should she adopt. Metzger cited a period of time during which
"some individuals on [E.M.'s] side * * * harassed [the maternal aunt] over the phone" and
would "just make her life more difficult while raising the children and she finally had to cut
that off." (Mar. 1, 2023 Tr. at 33.) According to Metzger, the maternal aunt "knows that
M.M. is suffering by not seeing her father," and it would "depend[] on how [E.M.] conducts
himself with regard to his interactions with her and * * * the family." (Mar. 1, 2023 Tr. at
33.) One of the reasons Metzger "strongly" recommended the maternal aunt be "considered
for adoption of the children is because she is * * * family." (Mar. 1, 2023 Tr. at 34.)

{¶ 46} Metzger related that M.M. stayed briefly with her paternal grandmother "as part of a safety plan that we had put in place after an incident with [E.M.] having some anger issues." (Mar. 1, 2023 Tr. at 54.) M.M. was removed from the grandmother's care because she "wouldn't adhere to the guidelines of the safety plan." (Mar. 1, 2023 Tr. at 54.) According to Metzger, E.M. "has missed a lot of visits." (Mar. 1, 2023 Tr. at 55.)

{¶ 47} E.M. was called to testify on his own behalf as if on direct examination. E.M. currently resides on Brehl Avenue, where he is going "through a sober living program [c]alled Cornerstone." (Mar. 1, 2023 Tr. at 88.) The program requires him to work, attend AOD and AA classes, and obtain housing. When asked whether he had a problem with drugs or alcohol, E.M. responded: "No, sir." (Mar. 1, 2023 Tr. at 89.) He acknowledged being addicted to marijuana, but denied that he drank alcoholic beverages. E.M. is not currently employed. He previously worked at the Burger King "[a]t the airport," and he stated he was looking for new employment. (Mar. 1, 2023 Tr. at 90.)

{¶ 48} E.M. began the Cornerstone program on January 2, 2023; he stated it is a "six-month program," and he anticipated finishing by the end of June. (Mar. 1, 2023 Tr. at 91.) M.M. was born in August 2014, and E.M.'s relationship with mother ended when M.M. was two years old.

{¶ 49} When asked the date of his last visit with M.M., E.M. responded: "I really don't remember * * * the day." (Mar. 1, 2023 Tr. at 94.) When questioned why he had not had any visits with her since prior to last Christmas, E.M. answered: "Well, it's a three no call, no show like that." (Mar. 1, 2023 Tr. at 94.) E.M. stated he was working on Saturdays so he "really couldn't make a lot of the visits." (Mar. 1, 2023 Tr. at 94-95.)

{¶ 50} In response to an inquiry whether he had mental health issues, E.M. stated: "I say as in PTSD. I been shot twice in my chest, * * * and I've been shot in both legs." (Mar. 1, 2023 Tr. at 95.) E.M. previously received treatment at Southeast, but he is not currently under any ongoing mental health treatment. E.M. stated he suffers "anxiety" and has been prescribed medication, "but I stopped takin[g] it." (Mar. 1, 2023 Tr. at 96.) According to E.M., the medication would "make [him] just * * * fall asleep in weird place[s]." (Mar. 1, 2023 Tr. at 96.) E.M. believed he has sufficiently addressed his concerns about PTSD and anxiety.

{¶ 51} On cross-examination, E.M. stated his desire is to "be there for my daughter." (Mar. 1, 2023 Tr. at 108.) He acknowledged that visiting M.M. only twice since October 1, 2022 did "not" reflect "being there for her." (Mar. 1, 2023 Tr. at 108.)

{¶ 52} On April 11, 2023, the juvenile court filed a decision and judgment entry finding by clear and convincing evidence that permanent custody was in the best interest of M.M., as well as M.M.'s siblings K.B. and O.B. The juvenile court therefore granted FCCS's request for permanent custody as to all three children.

## II. Assignment of Error

{¶ 53} Appellant appeals and assigns the following assignment of error for our review:

> The juvenile court's judgment that permanent court commitment of the minor child to Franklin County Children Services was in the minor child's best interests is against the manifest weight of the evidence.

## III. Analysis

{¶ 54} Under his single assignment of error, E.M. contends the juvenile court's grant of permanent custody of M.M. to FCCS was against the manifest weight of the evidence.[1] E.M.'s sole focus on appeal involves the juvenile court's consideration of the best interest factors under R.C. 2151.414(D).

{¶ 55} Under Ohio law, "[a]n appellate court will not reverse a juvenile court's determination in a permanent custody case unless it is against the manifest weight of the evidence." *In re A.R.*, 10th Dist. No. 20AP-201, 2021-Ohio-1794, ¶ 12, citing *In re [A.-J.]*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. In reviewing a trial court's judgment "granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." (Internal quotations omitted.) *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th

---

[1] We note the caption of the juvenile court's judgment entry appealed from lists the three case numbers corresponding to those of each of the three minor children (i.e., M.M., O.B., and K.B.). We further note the appeal in this case is from Franklin C.P. No. 19JU-3130 (i.e., "In the matter of: [M.M.]"), and the appellate brief of E.M., the father of M.M., makes clear he "only address[es] the facts and issues that are relevant to M.M. and [E.M.]." (Appellant's Brief at 2.)

Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37.   If the evidence before the juvenile court "is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." (Internal quotations omitted.)  *Id.*, quoting *K.M.*, 2015-Ohio-4682, at ¶ 13, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).  Accordingly, "[a]n appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." (Internal quotations omitted.)  *Id.*, quoting *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 56} Both federal and state courts recognize "[p]arents have a constitutionally protected fundamental interest in the care, custody, and management of their children." *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 13, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990).  Those rights, however, "are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *Id.*, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).  Accordingly, "in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child." *Id.*, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000).

{¶ 57} In Ohio, R.C. 2151.414 "governs the termination of parental rights." *Id.* at ¶ 14, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42.  A trial court's decision to award permanent custody requires it "to take a two-step approach." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18, citing *In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914.  The court must first determine "by clear and convincing evidence that one of five possible statutory grounds in R.C. 2151.414(B)(1) is established." *In re S.C-N.*, 10th Dist. No. 21AP-544, 2022-Ohio-3064, ¶ 62.  In this respect, "[o]nly one of the grounds must be met to satisfy the first prong of the two-part permanent custody test." *Id.*, citing *In re K.P.*, 12th Dist. No. CA 2021-11-016, 2022-Ohio-1347, ¶ 17.  If one of those grounds "is established, the trial court then determines if permanent custody is in the best interest of the child under the factors set forth in R.C. 2151.414(D)." *Id.*, citing *K.P.* at ¶ 18.

{¶ 58} R.C. 2151.414(B)(1) states in part:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 59} In the present case, FCCS moved for permanent custody alleging three of the grounds set forth in R.C. 2151.414(B)(1), i.e., (a), (b), and (d). The juvenile court found clear and convincing evidence supported the circumstances in R.C. 2151.414(B)(1)(a) (M.M. could not or should not be placed with either parent within a reasonable time), (B)(1)(b) (the child was abandoned), and (B)(1)(d) (M.M. had been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period).

{¶ 60} On appeal, E.M. does not dispute that M.M. was in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. As set forth above, in addition to its finding as to the applicability of R.C. 2151.414(B)(1)(d), the juvenile court made alternative findings under R.C. 2151.414(B)(1)(a) and (b). However, because the juvenile court's finding under R.C. 2151.414(B)(1)(d) is "not in dispute," the court "did not have to consider whether any of the alternative provisions of R.C. 2151.414(B)(1) applied."

*In re T.L.*, 10th Dist. No. 20AP-591, 2021-Ohio-3221, ¶ 15, citing *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 21; *In re G.P.*, 2d Dist. No. 2016-CA-88, 2017-Ohio-2883; ¶ 54; *In re G.R.*, 7th Dist. No. 17 HA 0002, 2017-Ohio-8917, ¶ 15; *In re K.L.*, 2d Dist. No. 2014-CA-31, 2014-Ohio-5576, ¶ 14. *See also In re J.W.*, 10th Dist. No. 22AP-382, 2023-Ohio-1582, ¶ 40 ("because the time requirements under R.C. 2151.414(B)(1)(d) were satisfied, it was unnecessary for the juvenile court to determine whether the children cannot or should not be placed with appellant within a reasonable time under R.C. 2151.414(B)(1)(a)"); *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 13 ("Because [the] appellant does not challenge the juvenile court's finding, pursuant to R.C. 2151.414(B)(1)(d), that the children had been in the custody of FCCS for 12 or more months of a consecutive 22-month period, we need not consider her challenge to the court's findings pursuant to R.C. 2151.414(B)(1)(a)").

{¶ 61} Once a trial court "determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then determine whether 'clear and convincing' evidence demonstrates that a grant of permanent custody is in the child's best interest." *In re A.U.*, 10th Dist. No. 20AP-594, 2021-Ohio-2658, ¶ 22, quoting *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). The standard of "[c]lear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. * * * It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." (Internal quotations omitted.) *Id.*, quoting *K.L.*, 2013-Ohio-3499, at ¶ 14.

{¶ 62} R.C. 2151.414(D)(1) states in part as follows:

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 63} Under the above statute, "no single factor is given greater weight than the others." *J.W.* at ¶ 41. Further, the focus with respect to "the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents." (Internal quotations omitted.) *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 57, quoting *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 20, citing *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist.1994).

{¶ 64} The first best-interest factor under R.C. 2151.414(D)(1)(a) requires a trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." With respect to this factor, the juvenile court made the following findings.

{¶ 65} According to the testimony of the caseworker, mother "has not attended face-to-face visits with [the] Minor Children since November 2019," and neither the agency nor the GAL "testified that any of the Minor Children currently have a bonded relationship with Mother." (Decision at 20.) The "only child about whom the Agency casework team and the GAL could attribute a significant bond to a parent was [M.M.]." (Decision at 20.) M.M. "lived primarily with her father, [E.M.], when the Agency became involved with the family and she was at one time ordered into [E.M.'s] temporary custody." (Decision at 20.) Since M.M.'s placement in FCCS's custody in September 2020, "there were periods of time during which they had regular contact." (Decision at 20.)

{¶ 66} M.M., at eight years of age, "is in a better developmental position to have long-term memories of her life with [mother] and [E.M.]." (Decision at 20.) However,

"bonding alone is not what the Court is tasked with considering," as "[t]he statute calls for an examination of the 'interaction and interrelationship' that the children have with their parents, but also with their siblings, relatives, and 'out-of-home providers.' " (Decision at 20.) In addition to M.M.'s "good interactions with [E.M.] at visits, [M.M.] has also experienced multiple instances where she was transported to and from the FCCS office for visits when [E.M.] never appeared nor attempted to cancel." (Decision at 20.) M.M. "also experienced lengthy gaps in her contact with [E.M.] during times he chose not to attend visits with her," and "[t]hus, [M.M.'s] interrelationship with [E.M.] also includes disappointment." (Decision at 20.)

{¶ 67} All of the minor children "have a bonded, close relationship with their kinship caregiver, their Maternal [] Aunt." (Decision at 20.) Both the caseworker and GAL "testified about the positive, loving interactions they have observed with the Minor Children and Maternal [] Aunt during the Minor Children's placement in her home," and the minor children "have no reason to doubt their [maternal] aunt's commitment to providing for their basic needs and keeping them safe and healthy." (Decision at 20-21.)

{¶ 68} Regarding the first best-interest factor, E.M. contends he has maintained a good relationship with M.M. all her life; that he was involved in her life when she was born, and that he cared for her in her earliest years when her mother was unable to provide care. E.M. cites testimony by the caseworker and GAL regarding the strong bond he has with M.M.

{¶ 69} As set forth above, the juvenile court recognized the bond between E.M. and M.M. and the record supports that finding. This court has noted, however, that "resolution of the first factor is not limited to merely the bond between child and parent." *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. Further, Ohio courts consider "the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor." *Id.* at ¶ 82.

{¶ 70} In the present case, the juvenile court heard evidence that E.M. was not consistent with visitations, including testimony by the caseworker as to an approximately one-year time period, "from March 2021 [until] around the same time 2022," when E.M. did not attend visits with M.M. (Feb. 27, 2023 Tr. at 149.) The caseworker further testified E.M.'s last visit with M.M. was December 3, 2022, and his current visitation schedule had

been suspended at the time of trial because of his "no call, no show." (Feb. 27, 2023 Tr. at 149.) Over the course of the case, E.M.'s visitations were removed from the schedule "at least six times" because of father's failure to call or attend. (Feb. 27, 2023 Tr. at 149.) The court cited the disappointment experienced by M.M. in being transported to the agency for scheduled visits that father failed to attend, and E.M. himself acknowledged the emotional impact those circumstances had on M.M.

{¶ 71} The juvenile court also heard testimony regarding the relationship between M.M. and her siblings, as well as M.M.'s relationship with her maternal aunt, i.e., M.M.'s current caregiver. The GAL testified that O.B. and K.B. have "the tightest bond," but that M.M. "is bonded with" her half-siblings, "particularly now, since she's been with them for the two years with [maternal] aunt." (Mar. 1, 2023 Tr. at 30-31.) According to the GAL, over the approximately two and one-half years the children have been with the maternal aunt, the children have "grown, they have thrived," and "[t]hey are bonded with her, [and] she with them." (Mar. 1, 2023 Tr. at 28-29.)

{¶ 72} Upon review, the record indicates the juvenile court properly considered the first best-interest factor, including the bond and interrelationship between M.M. and E.M., as well as the bond and interrelationship between M.M. and the other significant individuals in her life. While recognizing the bond between M.M. and father, the juvenile court further found a history of inconsistent visitation by E.M., and that M.M. is closely bonded with her siblings and her current caregiver. Upon review, the weight of the evidence supports the juvenile court's findings under R.C. 2151.414(D)(1)(a).

{¶ 73} With respect to the second best-interest factor, a juvenile court is to consider the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b).

{¶ 74} The juvenile court addressed this factor, citing the testimony of the GAL that M.M. "has expressed her desire to be reunited with her parents and she * * * was represented by counsel at trial." (Decision at 21.) The juvenile court therefore properly considered this factor, and the record supports that finding.

{¶ 75} E.M. emphasizes this factor, and maintains M.M. remained consistent in her desire to live with her father. However, while the juvenile court recognized M.M.'s desire to be reunited with her parents, this court has previously noted that R.C. 2151.414(D)(1)

"does not give any one factor greater weight than the others," but rather "the statute requires a weighing of all relevant factors." (Internal quotations omitted.) *M.W.*, 2020-Ohio-5199, at ¶ 26, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56, 64. Accordingly, the juvenile court "could not give [the child's] wishes under the R.C. 2151.414(D)(1)(b) factor greater weight than the other best interest factors." *Id. See also In re C.B.*, 3d Dist. No. 9-23-28, 2023-Ohio-4089, ¶ 20, citing *In re K.M.*, 3d Dist. No. 3-18-11, 2018-Ohio-3711, ¶ 27, quoting *In re S.M.*, 4th Dist. No. 14CA4, 2014-Ohio-2961, ¶ 36 ("the children's wishes, alone, do not require a trial court to deny an agency's motion for permanent custody," but rather "the children's wishes are a factor for the trial court to weigh along with others outlined in R.C. 2151.414(D)(1)") (Internal quotations omitted.).

{¶ 76} R.C. 2151.414(D)(1)(c) requires the trial court to consider the custodial history of the child, including "whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." Here, the juvenile court made findings that M.M. was removed from mother's parental care on March 22, 2019 "when [M.M.] was ordered into the temporary custody of [E.M.] and under the protective supervision of FCCS," and that M.M. "was ultimately removed from [E.M.'s] care and ordered into the TCC of the Agency on September 2, 2020." (Decision at 21.) The caseworker "testified that [M.M.] has also remained in FCCS'[s] continuous custody as of the trial date." (Decision at 21.) Further, "[a]t the time of the Trial, all of the Minor Children had been in the continuous temporary custody of [FCCS] for at least 29 months." (Decision at 22.)

{¶ 77} E.M. does not challenge the above findings of the juvenile court. Upon review, the juvenile court properly considered R.C. 2151.414(D)(1)(c), and the court's findings are adequately supported by the record.

{¶ 78} With respect to the fourth best-interest factor, R.C. 2151.414(D)(1)(d), a juvenile court is required to consider a child's need for a legally secure placement and whether that type of placement can be achieved without the grant of permanent custody. The juvenile court considered this factor and made the following findings.

{¶ 79} The parents in this case "have failed to substantially remedy the causes for the Minor Children's removal by failing to comply with the Case Plan." (Decision at 22.)

The placement of the children "in the kinship home of their Maternal [] Aunt has provided stability and nurturance that has allowed them to thrive," and there was "an abundance of [trial] testimony * * * to support that the Minor Children need a permanent placement." (Decision at 22.) The trial testimony established that M.M. "had previously been informally placed with Paternal Grandmother by [E.M.] in the summer of 2020, prior to [M.M.] being ordered into FCCS'[s] custody," and the testimony "revealed concerns about the cleanliness and sleeping accommodations in Paternal Grandmother's home during that time." (Decision at 22.) The minor children "are desperately in need of a secure placement," and "[t]he evidence supports the Agency's claim that this type of placement [cannot] be achieved without a granting of permanent custody." (Decision at 22.) The minor children "have stability in placement," and the "granting of permanent custody would allow the best opportunity for a legally secure placement." (Decision at 22.)

{¶ 80} On appeal, E.M. argues he had temporary housing at the time of trial while he was completing the last few months of a residential treatment program through Cornerstone. E.M. points to his own testimony that the Cornerstone program included an aftercare component that would assist him with obtaining permanent housing. E.M. argues he "anticipated" he would have housing "within just a few months" after trial. (Appellant's Brief at 25.) E.M. further argues he was actively seeking employment at the time of trial and contends he would have been able to meet M.M.'s needs upon completion of his current treatment program.

{¶ 81} While E.M. contends he "anticipated" having housing within a few months after trial, the record indicates E.M.'s housing situation throughout the history of the case has been less than stable. On this issue, the juvenile court made findings regarding E.M.'s "history of transient housing," noting E.M.'s living arrangements "became increasingly fluid and largely dependent on family and friends" even during the period he had court-ordered custody of M.M. (Decision at 15.) Further, the juvenile court cited testimony by the caseworker (Swaray) that, after M.M. was removed from E.M.'s custody, E.M. failed to successfully participate "in programs meant to assist him in securing housing." (Decision at 15.) Those findings are supported by the record, and the juvenile court could properly consider the issue of whether the parent failed to secure stable housing throughout the case.

*See M.W.*, 2020-Ohio-5199, at ¶ 40 ("Mother's inability to maintain housing throughout the case demonstrated that mother could not provide [child] with stable housing.").

**{¶ 82}** The decision of the juvenile court included findings that the parents failed to "consistently participate in and complete Case Plan services" despite the fact resources were provided to assist them with "mental health/AOD assessments and recommended treatment, drug testing, and parenting services." (Decision at 8.) The court observed that E.M., on cross-examination, "appeared either reluctant or unable to provide clear answers to questions about his participation in AOD/mental health programming, random drug testing, housing history, and his attendance at visits with [M.M.]." (Decision at 12.)

**{¶ 83}** The juvenile court cited the testimony of both the caseworker and GAL that "revealed challenges in their dealings with [E.M.], including his periodic unwillingness to sign releases of information and the need for repeated discussions with him about random drug testing through the Agency's contracted provider." (Decision at 12.) The record indicates the juvenile court deemed E.M.'s testimony less than credible, finding that "despite his denials of substance abuse issues, [E.M.] testified that he recently entered a sober-living program which may result in additional assistance in securing stable, independent housing," and that "[E.M.'s] testimony under cross-examination uncovered inconsistencies, intentionally vague answers, and denials that challenged his credibility." (Decision at 12.) The court found E.M. "was unable to provide specific answers, even about information as uncomplicated as his most recent visits with [M.M.]." (Decision at 12.)

**{¶ 84}** The juvenile court also found E.M. had failed to demonstrate "any period of sustained sobriety" or to have "successfully completed the AOD programming" in which he "currently report[ed] participating." (Decision at 14.) The court noted E.M. "was ordered by this Court to submit to random drug testing, which he has never cooperated [with] despite repeated conversations with the FCCS'[s] service team." (Decision at 14.) The juvenile court further found E.M. has "chronic chemical dependency issues" that render him "unable to provide a permanent home" for M.M. (Decision at 14.)

**{¶ 85}** This court has previously held, in addressing the provisions of R.C. 2151.414(D)(1)(d), " 'a legally secure permanent placement' is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *E.B.* at

¶ 32, quoting R.C. 2151.414(D)(1)(d), citing *In re M.B.*, 4th Dist. No. 15CA19, 2016-Ohio-793, ¶ 56, citing *K.M.*, 2015-Ohio-4682, at ¶ 28. In the present case, the juvenile court concluded that none of the parents "demonstrated that she/he can consistently meet the needs of his/her children and provide a safe and stable environment." (Decision at 9.)

{¶ 86} As set forth above, the juvenile court made findings regarding E.M.'s failure to substantially comply with case plan objectives, including housing, income, substance abuse, and mental health issues. The record further indicates that M.M., who has been in the temporary custody of FCCS for approximately two and one-half years, is currently thriving in a safe, stable environment under the care of her maternal aunt. Upon review, the record supports the juvenile court's determination that M.M. is "desperately in need of a secure placement," and that such placement cannot be achieved "without a granting of permanent custody." (Decision at 22.)

{¶ 87} R.C. 2151.414(D)(1)(e) requires consideration whether any of the factors set forth under R.C. 2151.414(E)(7) to (11) apply. The juvenile court made findings under this provision that the parents "have demonstrated an inability to protect and provide for the Minor Children," and that "[e]ach of the parents have abandoned the Minor Children in these cases in satisfaction of [R.C.] 2151.414(E)(10)." (Decision at 22.)

{¶ 88} E.M. does not specifically challenge this finding, and acknowledges that "[b]etween March of 2021 and sometime in 2022, [E.M.] had missed visits for a period that exceeded 90-days." (Appellant's Brief at 15.) As noted by FCCS, there was evidence presented at trial, through the testimony of the caseworker, indicating M.M.'s mother "had no contact with her children since 2019," that E.M. "himself attended no visits with M.M. for a year between March of 2021 and March of 2022," and that E.M.'s "last visit with M.M. occurred just shy of 90-days before the final trial date." (Appellee's Brief at 42.)

{¶ 89} Finally, "[i]n addition to the five enumerated factors, the statute provides that in determining the best interest of a child, the juvenile court shall consider 'all relevant factors.'" *J.W.* at ¶ 52, quoting R.C. 2151.414(D)(1).

{¶ 90} Here, with respect to any other relevant factors, the juvenile court cited the testimony of the GAL and caseworker who both "testified that it is in the Minor Children's best interest for the Court to grant the Agency's Motions and to allow the Minor Children to be placed for adoption." (Decision at 22.)

{¶ 91} The record before this court indicates the juvenile court properly reviewed the factors under R.C. 2151.414(D)(1) and weighed the evidence in considering whether the grant of permanent custody to FCCS was in the best interest of M.M. As recognized by the juvenile court, the record reflects a genuine bond of love and affection between E.M. and M.M., but the record further reflects, as also found by the court, "the circumstances giving rise to the filing have not been sufficiently alleviated." (Decision at 24.) Upon review, we conclude there was competent, credible evidence to support the juvenile court's finding, by clear and convincing evidence, that granting permanent custody to FCCS was in the child's best interest. Accordingly, the determination of the juvenile court was not against the manifest weight of the evidence. E.M.'s single assignment of error is not well-taken and is overruled.

## IV. Conclusion

{¶ 92} Based upon the foregoing, E.M.'s sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

DORRIAN and BOGGS, JJ., concur.